*In re* ESTATE OF ELEANOR JANE MILLER, Deceased (Lyle Blaine Miller, Petitioner-Appellee, v. James P. Kellstedt, Respondent and Contemnor-Appellant).—*In re* ESTATE OF ELEANOR JANE MILLER, Deceased (James P. Kellstedt, Petitioner-Appellant, v. Lyle Blaine Miller, Ex'r, Respondent-Appellee).

Third District   Nos. 3—89—0212, 3—89—0213 cons.

Opinion filed March 30, 1990.—Rehearing denied May 23, 1990.

James P. Kellstedt, of Peoria Heights, appellant *pro se.*

Bernardi, Bernardi & Bode, of Pekin (Kirk W. Bode, of counsel), for appellee.

JUSTICE BARRY delivered the opinion of the court:

This cause arose out of probate proceedings upon the demise of Eleanor Jane Miller, who died testate on May 17, 1986. The surviving spouse and executor of her will, Lyle Blaine Miller, was represented by Attorney James P. Kellstedt in the probate matter. Upon preparation of the final accounting, Miller refused to pay Kellstedt's fees and costs, which he claimed in the amount of $2,451.50 After a hearing on Kellstedt's petition for fees and costs the circuit court of Tazewell County entered judgment for Kellstedt in the amount of $989. The court further ordered Kellstedt to turn over certain securities that he had retained during the course of his employment in the probate matter. Kellstedt appeals from that order as well as from a subsequent order finding him in indirect civil contempt and imposing sanctions for Kellstedt's failure to comply with the court's turnover order. For reasons that follow, we affirm.

The relevant facts as presented to the trial court and as they now appear in the record on appeal establish that Kellstedt duly filed a petition for probate of the decedent's will and for letters testamentary on June 2, 1986, and that letters of office were issued to Lyle Blaine Miller as executor on the same date. On February 2, 1987, the first of three publications of the claim notice was made. The inventory of the estate was filed on December 30, 1988. According to Kellstedt, he suffered numerous personal difficulties during this period, including an automobile accident, health problems, the death of his only son and his mother and an unmanageable workload in his law practice.

The decedent's estate subject to probate was valued at $43,225.49. The value of decedent's nonprobate estate was $318,188.89. No claims were filed against or on behalf of the estate, no one contested the will, and no estate taxes had to be paid. There were, however, several securities held by the deceased in joint ownership or in trust which had to be transferred to her surviving husband and children. It appears that Kellstedt was instrumental in accomplishing the transfer of certain stock certificates, and Miller facilitated the process in others. When Miller met with Kellstedt to go over the final accounting, he refused to pay attorney fees and costs claimed by Kellstedt in the amounts of $2,137.50 and $314, re-

spectively. Accordingly, Kellstedt filed his petition for fees and costs contemporaneously with the inventory of the estate and the final accounting on December 30, 1988.

At the hearing on Kellstedt's petition, the court received testimony of Kellstedt and two attorneys practicing in the Peoria area who agreed that Kellstedt's hourly charge of $75 was reasonable and that $2,137.50 was a reasonable fee considering the size of the estate and Kellstedt's claimed expenditure of 28.5 hours of professional time on behalf of the estate. Kellstedt introduced copies of blank time records used in his office and a two-page handwritten "summary" of his activities in the case.

Miller testified that he had urged Kellstedt to proceed with the case numerous times between 1986 and 1988 and had in fact taken upon himself the task of communicating with corporate transfer agents with respect to some of the securities for which Kellstedt claimed responsibility. During the hearing Kellstedt admitted that he had retained possession of several of the stock certificates pursuant to his common law retaining lien for attorney fees.

The trial court, after hearing all of the evidence, concluded that much of the time claimed by Kellstedt was not, in fact, necessary to the orderly and efficient administration of this estate. The court questioned the evidentiary value of Kellstedt's documentation of his time, finding the handwritten summary "virtually undecipherable." With respect to the stock transfers, the court found Kellstedt's efforts redundant and unproductive. Likewise, the court found Kellstedt's claim of six trips to Pekin excessive, and reduced the number of reimbursable trips to three. Accordingly, the court determined that Kellstedt was entitled to fees for only 10 hours of professional time, and awarded him $75 per hour, or a total of $750, plus $239 in reimbursable costs. The court further ordered that Kellstedt turn over to Miller all of the retained assets within 14 days of its February 14, 1989, order.

Kellstedt failed to comply with the court's turnover order, and on March 14 Miller filed a petition for rule to show cause why Kellstedt should not be found in contempt. The court entered an order setting a hearing on the petition for April 3, 1989. Two days later, on March 16, Kellstedt filed his post-trial motion requesting a rehearing on his petition for fees. Kellstedt specifically "consented" to the court's reduction of his claimed costs. On April 3, at Kellstedt's insistence, the court agreed to entertain the show cause hearing prior to hearing Kellstedt's post-trial motion. At the close of all testimony, the court found Kellstedt in indirect civil contempt of court. The court granted

Miller's request for attorney fees and costs incurred in connection with the show cause petition in amounts of $210 and $20, respectively, and committed Kellstedt to the county jail for six months or until he surrendered the retained certificates. On April 5, Kellstedt turned over three certificates, the combined value of which exceeded $12,000, to the clerk of the circuit court. He made it clear to the trial judge, however, that he did not intend to relinquish two other certificates, the combined value of which approximates Kellstedt's fees claim. Kellstedt's post-trial motion requesting reconsideration of this order was subsequently denied, as was his March 16 post-trial motion, and Kellstedt has appealed from both denials.

Kellstedt initially contends that the court's decision to reduce the amount of attorney fees for the probate work was contrary to the manifest weight of the evidence and an abuse of discretion. We do not agree.

The trial court enjoys broad discretion in determining the reasonableness of compensation claimed by an attorney representing an executor. The ultimate determination must be based on the facts and circumstances of the particular case before the court. (*In re Estate of Marshall* (1988), 167 Ill. App. 3d 549, 553, 521 N.E.2d 637, 640.) Factors that may be considered include: "the size of the estate, the work involved, the skill evidenced by the work, time expended, the success of the efforts involved, and the good faith and efficiency with which the estate was administered." (*Marshall*, 167 Ill. App. 3d at 553, citing *In re Estate of Thomson* (1986), 139 Ill. App. 3d 930, 939, 487 N.E.2d 1193, 1200.) It should also be noted that the trial court is not bound by the opinion of expert witnesses as to the reasonableness of fees claimed, but may rely on its own knowledge and experience and use independent judgment in setting the amount of compensation. *Marshall*, 167 Ill. App. 3d at 553, citing *In re Estate of Brown* (1978), 58 Ill. App. 3d 697, 374 N.E.2d 699.

It is apparent from the record on appeal that the trial court in this case rendered its decision giving ample consideration to all relevant factors based on the court's knowledge about the particular estate in question, the evidence and testimony admitted at the hearing on fees and the court's independent experience and judgment. Merely because the court chose not to abide by the opinion of Kellstedt's expert witnesses that the amount claimed was reasonable does not suggest that the court's determination was either contrary to the manifest weight of the evidence or an abuse of discretion. Kellstedt failed to present documentation adequate to support the expenditure of 28.5 hours of his time. Just as an attorney may not ex-

pect the court to look favorably upon a stack of time sheets dumped on the bench (see *FMC Corp. v. Varonos* (7th Cir. 1990), 892 F.2d 1308), neither should an attorney expect to support his claim with blank time forms and an unreadable scrawled "summary" such as Kellstedt submitted here. Kellstedt's expert witnesses could not attest to Kellstedt's actual expenditure of 28.5 hours, but only to the fact that Kellstedt had claimed that amount of billable time. Considering the small size of the probate estate and the general lack of complexity involved, the court was justified in reducing Kellstedt's billable time to 10 hours. Accordingly, we affirm the circuit court's fee determination.

■ Kellstedt next contends that the circuit court had no authority to order him to turn over the retained securities without providing any safeguard for his collection of fees. Initially, we do not agree that the court had no authority to enter the turnover order. The fact that Kellstedt had retained stock certificates pursuant to his common law lien for unpaid fees was a matter brought out during the hearing on Kellstedt's fees. Kellstedt did not object to Miller's turnover request during the course of those proceedings.

Further, Kellstedt's argument that he could not relinquish the stock certificates without losing his retaining lien is not well taken. The law respecting common law retaining liens is that the involuntary relinquishment of retained property pursuant to a court order does not result in the loss of the lien. *Brauer v. Hotel Associates, Inc.* (1963), 40 N.J. 415, 192 A.2d 831; 7 Am. Jur. 2d *Attorneys at Law* §322, at 335 (1980).

■ Kellstedt does not assert that Miller refuses to pay him the fees determined by the court to be reasonable compensation for the estate case. In his appellate brief, Miller affirmatively states that he "has tendered and continues to tender to Attorney Kellstedt the full amount of the judgment contained in Judge Reardon's order of February 14, 1989." The record on appeal neither confirms nor refutes this statement. However, we find it significant that Kellstedt, an astute trial lawyer and appellate practitioner for several decades, has not taken issue with this statement either in his reply brief or in oral argument. Once the court determined the amount of fees Kellstedt was entitled to, Kellstedt had no right to both maintain his original claim and continue to hold the securities hostage upon Miller's tender of fees as judicially determined. By maintaining his claim to a retaining lien, Kellstedt's lien rights were adequately preserved. *Brauer*, 40 N.J. at 420, 192 A.2d at 835; see also *People v. Altvater* (1974), 78 Misc.2d 24, 355 N.Y.S.2d 736.

■ Kellstedt also complains that the court's turnover order and enforcement of it via exercise of the court's contempt power violated his constitutional guarantee of due process. This argument is without merit, given that Kellstedt was afforded every opportunity to be heard and to present factual and legal grounds in defense of his position. The fact that the court did not embrace Kellstedt's arguments does not mean that due process was not afforded him.

■ ■ With respect to the contempt proceedings, Kellstedt enjoyed the full protection of legal due process as well. The court has inherent authority to enforce its orders by the use of its contempt power. Generally, the failure to obey a court's order is considered civil contempt, and where the refusal takes place outside the presence of the court, it is indirect civil contempt. (*People v. Mowery* (1983), 116 Ill. App. 3d 695, 701-02, 452 N.E.2d 363, 369; 12 Ill. L. & Prac. *Contempt* §5 (1983).) Civil contempt is coercive in nature rather than punitive, and to be sustained on review, an order of civil contempt must place within the hands of the contemnor "the key to his cell." (*People v. Mowery* (1983), 116 Ill. App. 3d 695, 452 N.E.2d 363; *People v. Gholson* (1952), 412 Ill. 294, 106 N.E.2d 333; *Eastman v. Dole* (1919), 213 Ill. App. 364; 12 C.J.S. *Contempt* §93, at 269 (1963); 12 Ill. L. & Prac. *Contempt* §87 (1983).) As noted by the court in *Mowery*, "The inherent power of contempt is a powerful one; it is not to be used lightly nor when other adequate remedies are available; if it is used, it must conform strictly to the dictates of the law." *Mowery*, 116 Ill. App. 3d at 704, 452 N.E.2d at 370.

■ In this case Kellstedt was given notice that his failure to comply with the court's turnover order could result in a finding of contempt. Kellstedt was afforded an opportunity to show cause why such finding should not be entered against him and sanctions imposed. As we have stated above, Kellstedt's unhappiness with the court's reduction of his fees is not good cause to retain property subject to a common law retaining lien in the face of a court order to turn over the property. Moreover, there is no question but that Kellstedt was given the keys to his cell in the court's provision for purging the contempt by turning over the stock certificates prior to the time set for him to be committed to the county jail. Although three of the certificates were surrendered subsequent to the court's entry of a rule to show cause, Kellstedt continues to retain two. Under the circumstances, the court was entirely justified in finding that Kellstedt's steadfast refusal to comply with the February 14 order was wilful and contumacious. The sanctions imposed, given the liberal opportunity to purge, are not unduly harsh.

In sum, we find that the trial court did not err in finding Kellstedt in indirect civil contempt of court and in imposing sanctions conditioned upon the contemnor's continued retention of his former client's property.

The judgment of the circuit court is affirmed.

Affirmed.

HEIPLE, P.J., and SCOTT, J., concur.